**1306**

Robert C. WILDMAN; Idros R. Wildman, husband and wife; Dana L. Wildman, Raymond L. Godwin; Candra Godwin, husband and wife; Danny Leo Regensberg, Wynona Rae Regensberg, husband and wife; Elma Regensberg; Bernard E. Godwin; Margueritte Godwin, husband and wife; Reginald E. Chapman; and Richardson Desert Corporation, a California corporation, Plaintiffs/Counterclaim Defendants/Appellants,

v.

UNITED STATES of America; Fort Mojave Indian Tribe; Spirit Mutual Farms, Inc.; Mohave Electric Co-Op, Inc.; Donald R. Brown; Ronald Fohs; Connecticut Mutual Life Insurance Company, Defendants/Appellees,

and

Willow Valley Club; and McKellips Land Corporation, Defendants/Counterclaimants/Appellees.

No. 86–2518.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 17, 1987.

Decided Sept. 14, 1987.

Janet Napolitano, Phoenix, Ariz., for plaintiffs-appellants.

Kathleen P. Dewey, Washington, D.C., Dale T. White, Boulder, Colorado, Charles D. Wahl, William C. Blakley and Larry G. Haddy, F. Patrick Barry, Dept. of Justice, Phoenix, Ariz., for appellees.

Before HUG, NELSON and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

In an action to quiet title to land, Robert C. Wildman and Idros R. Wildman, Dana L. Wildman, Raymond L. and Candra Godwin, Danny Leo and Wynona Rae Regensberg, Elma Regensberg, Bernard E. and Margueritte Godwin, Reginald E. Chapman and Richardson Desert Corporation (collectively

known as Calzona) appeal from summary judgment in favor of the United States and the Fort Mojave Indian Tribe (the Tribe), 638 F.Supp.1097. We affirm the judgment of the district court.

## FACTS

The Mohave have lived on the lower Colorado River since probably A.D. 1150. They were in this area when first sighted by the Spanish in 1604. A true tribe, the Mohave preserved their identity and held their ancestral homeland in substantial independence until well into the nineteenth century. Ortiz, *Handbook of North American Indians: Vol. 10, Southwest,* (1983) 55–56.

The Tribe traces its title to the disputed land on the east bank of the Colorado River to Executive Order 1267 signed by President Taft on December 1, 1910 establishing certain land as part of the Fort Mojave Indian Reservation. In the late 1950's the Secretary of the Interior approved a right of way across the claimed lands in favor of the Four Corners Pipeline Co. In 1975 the Tribe leased the claimed lands to Spirit Mountain Farms, Inc., which occupied, cleared, and cultivated this property. At the same time Mohave Electric Co. constructed and began operation of power transmission facilities upon it.

The Tribe's title is disputed by Calzona. Calzona owns property near Needles, California on the west bank of the Colorado River described in the following terms:

> Lots 1 and 2 (or the fractional west half of the northeast corner) and Lot 3 or the fractional north half of the southeast corner) of fractional section 36 Township 10 north, Range 22 east, San Bernardino Base and Meridian and all lands accreted thereto.

Title to this property is derived from a patent issued in 1929 by the State of California to G.P. Louthain. Title passed from Louthain to his widow and from her to J.H. and Eula Gates, who in turn deeded their interest to Elgin Gates. In 1968 Elgin Gates conveyed his interest in lots 1, 2, and 3 to Calzona excepting "that portion lying Easterly of the mean low water mark on the West bank of the Colorado River." As

of this date, Calzona had no interest in property on the east bank of the Colorado. However, in December 1969 Elgin Gates quitclaimed his interest in the east bank land to Calzona.

The basis for Calzona's claim is that the claimed land on the east bank—approximately 66.6 acres—was once part of an island known as Goat Island lying in the Colorado River. The island was formed between 1884 and 1912 by two channels of the river. At this time the main channel of the river was to the east and completely divided the island from Arizona. In about 1916, the river began to rechannel itself and the main channel cut off Goat Island from California on the west while the eastern channel filled with silt and united Goat Island to Arizona. Calzona's position is that the change which made Goat Island part of the eastern bank was effected by avulsion and that under applicable law this land belongs to California property owners even though the land is now separated from California by the Colorado River.

In 1959 several individuals brought an action to quiet their title to other parcels on Goat Island. The United States intervened, asserting the claim of the Tribe to this property and arguing that the land had moved by accretion to the Arizona side. The *opposing* contention was that the sudden shift in the course of the Colorado meant that Goat Island had moved to Arizona by avulsion and that the lands still were part of California. In *Sherrill v. McShan,* 356 F.2d 607 (9th Cir.1966) it was held that the district court for the District of Arizona had no jurisdiction because Goat Island was part of California.

Calzona's grantor, Elgin Gates, has filed two affidavits in this case. In the first, prepared by counsel for the United States, he explained why he quitclaimed the claimed lands:

> I was aware that if I wanted clear title to these lands, I would have to litigate. Based upon my familiarity with the area and the confusion regarding ownership of lands along the Colorado in Arizona, I believed that the States of Arizona and

California and the United States also claimed a portion of the accreted lands. He further stated that he "passed this information on to Mr. Robert Richardson, a representative of the Calzona Corporation." He added that he was unsure of the extent of his claim to the land and was "aware in 1969 that the United States and possibly the Indians also may have had claim to the accreted lands."

In the second affidavit, attached to a motion by Calzona, Gates declared:

In 1969 I gave Calzona a quitclaim deed for the accreted lands. I used a quitclaim instead of a grant deed because I did not know the full extent of the accreted lands; a survey had never been performed. However, I knew that these were accreted lands because my lands were part of Goat Island and I knew that the court had determined that Goat Island was accreted land to the California side of the river.

At the time I gave the quitclaim deed to Calzona, neither the United States nor the Fort Mojave Indian Tribe had made any claim to the accreted lands. Specifically: (a) no signs were posted; (b) no fences or other structures were erected; (c) no cultivation or other evidence of an interest were recorded either in Mohave County or San Bernardino County; (d) no deeds or other evidence; (e) no correspondence nor notice of any kind was given to me that the Government or the Indians were making a claim.

Thus, I knew of no claim to the accreted lands by the United States or the Fort Mojave Indian Tribe in 1969. I knew only that because they had land on the other side of the river, they might someday make a claim. That is why I had the Government put the language on page 4 of my Affidavit that the Government or the Indians "may" have had claims.

## PROCEEDINGS

Calzona filed its complaint on March 28, 1985 seeking to quiet title to the claimed land under 28 U.S.C. § 2409a. Jurisdiction of such suits rests in the district courts under 28 U.S.C. § 1346(f). The United States answered asserting that the court lacked jurisdiction because the property consists of Indian lands and because the action was barred by the 12 year statute of limitations of 28 U.S.C. § 2409a. The United States also asserted ownership by adverse possessions under ARS § 12–525 and 12–526. The Tribe asserted the defense that subject matter jurisdiction was lacking because the lands were Indian lands and because the Tribe was immune from suit by virtue of sovereign immunity.

On motion for summary judgment the court held that the United States had not waived sovereign immunity as to any suit for such Indian lands and that therefore the court lacked jurisdiction and further that the statute of limitations had begun to run in 1969 and now barred any action by the plaintiffs. Calzona appealed.

## ISSUE

Is Calzona's action barred by the sovereign immunity of the United States?

## ANALYSIS

■ The Quiet Title Act, 28 U.S.C. § 2409a, under which Calzona sues, expressly declares: "This section does not apply to trust or restricted Indian lands...." Calzona contends that a bare assertion by the United States or the Tribe that the lands in question are Indian lands is not enough to bring this exception into play; that there must be "a substantial possibility" of a claim. *Spaeth v. Secretary of Interior*, 757 F.2d 937, 943 (8th Cir.1985); *Newman v. United States*, 504 F.Supp. 1176, 1179 (D.Ariz.1981).

Calzona asserts that there is no substantial possibility of a claim because to create such a possibility the United States and the Tribe would have to show that the course of the Colorado River was different from what it actually has been—that they would have to show that the land had moved by accretion to the east after 1912. Calzona compares the likelihood of the government and the Tribe's claim here to the likelihood of proving an Indian title to downtown Los Angeles. The land physically moved by avulsion to the Arizona side; legally it belongs to the California side—that much, Calzona says, is indisputable.

Calzona adds that the government is estopped from relitigating the river's movement around Goat Island because the United States on behalf of the Tribe actually litigated this issue in *Sherrill v. McShan.* The claim of the United States and the Tribe to Goat Island was made publicly in the litigation in the *Sherrill* case. Eminent counsel—William H. Rehnquist for the plaintiffs, John P. Frank for the defendants, Carl A. Muecke and then William Copple for the United States—represented the parties. The case went twice to this court. 283 F.2d 462 (9th Cir.1960) and 356 F.2d 607 (9th Cir.1966). The issue was decided adversely to the government. 356 F.2d at 609–11.

■ We do not find that the qualified waiver of sovereign immunity made by the Quiet Title Act permits acceptance of Calzona's contentions. Nothing in the statute or its history suggests that the United States was to be put to the burden of establishing its title when it has a colorable claim and has chosen to assert its immunity on behalf of land of which the government declares that it is the trustee for Indians. In the instant case, the government's claim is colorable because despite the decision in *Sherill,* the government has the legal argument that non-mutual offensive collateral estoppel may not be applicable against it. *Cf. United States v. Mendoza,* 464 U.S. 154, 162, 104 S.Ct. 568, 573, 78 L.Ed.2d 379 (1984).

In the drafting of the statute that became the Quiet Title Act the government insisted on the Indian lands exception to the waiver of sovereign immunity and pointed to its "solemn obligations to the Indians," Department of the Interior, *Report on S.216,* 1972 *U.S.Code Cong. and Ad.News* 4556, 4557, and to its "specific commitments" to the Indians. *See Block v. North Dakota,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). The United States "cannot be sued at all without the consent of Congress. A necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied." *Id.* at 287, 103 S.Ct. at 1819–20.

The ordinary reason for enforcing sovereign immunity—reasons not free from challenge and not always very attractive—are reinforced when Indian lands are in question. The 52.5 million acres held in trust by the United States for the Indians are the tribes' "single most important economic resource." F. Cohen, *Handbook of Federal Indian Law* (1982 ed.) 471. The interests held by the tribes as cestuis que trust are "a unique form of property right in the American legal system, shaped by the federal trust over tribal land and statutory restraints against alienation." *Id.* at 472. The land is the essential base of tribal culture, development, and society. *Id.* at 509. As trustee, the United States properly acts with the jealousy of a fiduciary to protect this base.

■ Sovereign immunity, therefore, prevents the district court from exercising jurisdiction. The immunity of the government applies whether the government is right or wrong. The very purpose of the doctrine is to prevent a judicial examination of the merits of the government's position.

Even if non-mutual collateral estoppel could be applied offensively against the government by a plaintiff—a point which we do not need to decide and do not decide—there is no forum here in which to invoke the doctrine. The suit is stopped at the threshold by the government's immunity. By the same token, there is no reason to consider the defense that the plaintiffs' suit is barred by the passage of time. Jurisdiction does not exist to consider this defense.

Equities would not halt the operation of such a stern doctrine as sovereign immunity, but plaintiffs who have been informed of their grantor's doubts as to his title and have for ten dollars taken a quitclaim to the land; who paid no taxes on the property for eleven years; and who sat by for ten years while the land was made arable— plaintiffs such as these do not have equities to invoke. The Mohave, or their les-

sees, have tilled the land since 1975; it is the Mohaves' to keep.

AFFIRMED.

HUG, Circuit Judge, separately concurring:

I concur in the majority opinion, but write separately to emphasize that we do not need to determine whether a bare assertion of a claim would be sufficient to invoke the Indian land exception, because it is clear that the claim of the United States that the land is Indian land is substantial. There are legitimate questions of law and fact that are present. Whether the land became connected to Calzona's land on the west bank by accretion, and whether the land later became connected to the Indian land on the east bank by accretion or avulsion, are legitimate questions of law and fact that would require resolution.

Had there been a final and binding judicial adjudication of title against the Tribe, the reassertion of a claim by the Government would be insufficient to invoke the exception. However, there was no such adjudication. The question of title was not resolved in *Sherrill v. McShan*, 356 F.2d 607 (9th Cir.1966). We held that the questions of fact resolved by the district court were not clearly erroneous and that, under the facts presented in that case, the territorial jurisdiction of the United States District Court of Arizona did not extend to the Goat Island property. However, the opinion carefully noted:

> [W]e are not concerned on this appeal with questions of ownership of, or title to, the real property involved in this case or the conflicting claims of title thereto asserted by the respective parties to this appeal. The district court expressly declared that it was without jurisdiction to do so.

356 F.2d at 610.

Although the Government contended in that case, as in this case, that Goat Island was a part of the east bank, questions of title were excluded from the resolution of that case. There would, in any event, be a serious question of whether nonmutual offensive collateral estoppel could be applied against the Government. *See United States v. Mendoza*, 464 U.S. 154, 162, 104 S.Ct. 568, 573, 78 L.Ed.2d 379 (1984). The important fact is that a substantial unresolved claim is made by the Government that the land in question is Indian land.