FILED
United States Court of Appeals
Tenth Circuit

June 7, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

IOWA TRIBE OF KANSAS AND
NEBRASKA; MARK PARKINSON,
Governor of State of Kansas,

        Plaintiffs - Appellants,

SAC AND FOX NATION OF
MISSOURI; PRAIRIE BAND OF
POTAWATOMI INDIANS,

        Plaintiffs,

v.

KENNETH LEE SALAZAR, Secretary of
the Interior,

        Defendant - Appellee.

No. 08-3277

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:96-CV-04129-RDR-DJW)**

---

Mark S. Gunnison, Payne & Jones, Chartered, Overland Park, Kansas, (Michael Leitch, Office of the Attorney General for the State of Kansas, Topeka, Kansas, with him on the briefs) for Plaintiffs–Appellants.

Allen M. Brabender, United States Department of Justice, Environment & Natural Resources Division, Washington, DC, (Marietta Parker, Acting United States Attorney, and Jackie A. Rapstine, Assistant United States Attorney, Topeka, Kansas; John C. Cruden, Acting Assistant Attorney General, and William Lazarus, United States

Department of Justice, Environment & Natural Resources Division, Washington, DC with him on the briefs) for Defendant–Appellee.

Before **LUCERO**, **MURPHY**, and **HOLMES**, Circuit Judges.

**LUCERO**, Circuit Judge.

This appeal is part of a long-running dispute over whether the Secretary of the Interior (the "Secretary") properly took a small tract of land into trust on behalf of the Wyandotte Tribe of Oklahoma. Because the Secretary has already taken the land at issue into trust, sovereign immunity precludes the relief sought by plaintiffs. Consequently, we dismiss the appeal for want of jurisdiction.

**I**

We have previously described the underlying dispute in this matter and will recite only the details directly relevant to this appeal.[1] This case arises from a dispute over the status of a 0.52-acre parcel of land in Wyandotte County, Kansas, known as the Shriner Tract. The Wyandotte Tribe of Oklahoma sought to purchase the Shriner Tract in 1996 so that the United States could place the land into trust on behalf of the tribe. A gaming facility was to be built on the tract. Notice of intent to take the land into trust pursuant to

---

[1] For more expansive accounts, see Governor of Kansas v. Kempthorne, 516 F.3d 833 (10th Cir. 2008), and Sac & Fox Nation of Missouri v. Norton, 240 F.3d 1250 (10th Cir. 2001).

Public Law 98-602, 98 Stat. 3149 (1984), was published by the Secretary on June 12, 1996. Congress provided that $100,000 of the funds appropriated by Public Law 98-602 "shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of" the Wyandotte Tribe. 98 Stat. at 3151, § 105(b)(1). The tribe represented that it intended to acquire the Shriner Tract using these Public Law 98-602 funds.

Shortly thereafter, the Governor of Kansas, the Sac and Fox Nation of Missouri, the Iowa Tribe of Kansas and Nebraska, and the Prairie Band of Potawatomi Indians sued under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., to enjoin the Secretary's planned course of action. Plaintiffs were signatories to a tribal-state compact that permitted the tribes to operate gaming establishments in Kansas; the opening of a casino on the Shriner Tract by the Wyandotte Tribe could affect the plaintiff tribes' plans to operate their own gaming facilities. Plaintiffs argued inter alia that the funds used by the Wyandotte Tribe to acquire the Shriner Tract did not come exclusively from Public Law 98-602 funds. If the Wyandotte Tribe used other funding to purchase the Shriner Tract, the Secretary's decision to acquire the land was arguably improper.

And thus began a case that would spawn recurring trips from the district court to the Tenth Circuit and back. Shortly after plaintiffs filed their initial complaint, the district court granted them a temporary restraining order ("TRO") enjoining the Secretary from taking the Shriner Tract into trust on behalf of the Wyandotte Tribe. The Wyandotte Tribe intervened for the purpose of challenging the TRO and appealed the

-3-

matter to the Tenth Circuit. Before this court, plaintiffs argued that the TRO was necessary because the district court would be deprived of jurisdiction to review the Secretary's actions once the Shriner Tract was actually taken into trust. The Wyandotte Tribe and United States Attorney countered that an emergency stay of the TRO was needed because, otherwise, the tribe would lose its right to acquire the Shriner Tract pursuant to a land contract. They also represented that lifting the TRO would "not affect or bar the ultimate resolution of whether [the Shriner Tract] can be used for Class III gaming pursuant to the Indian Gaming Regulatory Act." Determining that dissolution would best preserve the status quo, we ordered the TRO dissolved:

> subject to the conditions which constitute the law of this case, that the respective rights of the parties to obtain judicial review of all issues which have been raised in the complaint below shall be preserved, including standing of all parties, jurisdiction, compliance by the Secretary with all requirements of law, and the ultimate question of whether gaming shall be permitted on the subject land.

The Wyandotte Tribe then closed on the Shriner Tract, and the Secretary took the land into trust on the tribe's behalf.[2]

The district court then dismissed plaintiffs' complaint, determining that the Wyandotte Tribe was a necessary and indispensible party that could not be joined due to sovereign immunity. Sac & Fox Nation of Mo. v. Babbitt, 92 F. Supp. 2d 1124, 1129 (D.

---

[2] Pursuant to Federal Rule of Evidence 201(d), we take judicial notice of a warranty deed demonstrating that the Wyandotte Tribe conveyed the Shriner Tract to the United States "in trust for the benefit of the Wyandotte Tribe of Oklahoma" on July 15, 1996.

Kan. 2000).  We reversed that ruling on appeal.  See Norton, 240 F.3d at 1259-60.

Further, we concluded that the Secretary acted arbitrarily in finding that the Wyandotte

Tribe used only Public Law 98-602 funds to purchase the Shriner Tract.  Norton, 240

F.3d at 1263-64.  Accordingly, we remanded "to the district court with directions to enter

partial judgment consistent with our holdings and to remand in part to the Secretary for

further consideration of whether Pub. L. 98-602 funds were used for the acquisition."

Norton, 240 F.3d at 1253.  The issue of the United States' sovereign immunity was not

discussed.

On remand, the district court entered partial judgment, remanded to the Secretary,

and closed the case.  See Kempthorne, 516 F.3d at 838.  Reaffirming an earlier decision,

the Secretary determined that only Public Law 98-602 funds were used to acquire the

Shriner Tract.  See id. at 839.  After a new lawsuit was filed, the district court upheld the

Secretary's determination under the APA.  See id. at 839-40.  However, we vacated the

district court's judgment on appeal, holding that sovereign immunity barred plaintiffs'

second lawsuit.  We reasoned that Congress had not waived sovereign immunity for

challenges to the United States' title to real property held in trust for an Indian tribe.  Id.

at 841-46 (interpreting the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a).  At the same

time, we expressly reserved the question of "whether the United States could divest a

court of jurisdiction if it took this land into trust for the Wyandotte Tribe after the

complaint was filed and served."  Kempthorne, 516 F.3d at 844 n.5.

Plaintiffs then successfully moved the district court to re-open their original

-5-

lawsuit—which was filed before the Shriner Tract was taken into trust—pursuant to Federal Rule of Civil Procedure 60(b)(6). Plaintiffs' success, however, was short-lived: the district court later dismissed the initial lawsuit for lack of subject matter jurisdiction. Sac & Fox Nation of Mo. v. Kempthorne, No. 96-4129-RDR, 2008 WL 4186890 (D. Kan. Sept. 10, 2008) (unpublished). It determined that the United States had not waived its sovereign immunity vis-à-vis plaintiffs' claim because plaintiffs challenged the United States' title to real property held in trust for an Indian tribe. In so holding, the court declined to adopt plaintiffs' position that sovereign immunity determinations should be made by reference to the facts in existence at the time a complaint was filed. The Governor of Kansas and the Iowa Tribe of Kansas and Nebraska timely appealed.

**II**

**A**

Before proceeding to our analysis, we note that the issue of whether the Wyandotte Tribe may open a gaming facility on the Shriner Tract is not before us. In dissolving the TRO in 1996, we explicitly referenced the position of the United States Attorney and the Wyandotte Tribe that dissolution would "not affect or bar the ultimate resolution" of that issue, which is now the subject of separate proceedings. See Wyandotte Nation v. Nat'l Indian Gaming Comm'n, 437 F. Supp. 2d 1193 (D. Kan. 2006) (remanding to the Secretary the question of whether gaming may be conducted on the Shriner Tract). Therefore, the sole issue before us is whether we retain jurisdiction over plaintiffs' challenge to the Secretary's acquisition of the Shriner Tract in trust on

behalf of the Wyandotte Tribe.

To evaluate this limited question, we must begin by classifying plaintiffs' cause of action. At the time they filed their complaint, plaintiffs sought review of a decision made by an agency: the Secretary's decision to take the Shriner Tract into trust. This type of suit is authorized by the APA, which provides both a cause of action and a waiver of sovereign immunity for claims in which a plaintiff has suffered "a legal wrong because of agency action." 5 U.S.C. § 702. Consequently, when their complaint was filed and served, sovereign immunity did not bar plaintiffs' claim.

Once the Secretary took the Shriner Tract into trust, however, the nature of plaintiffs' claim changed. Unlike their complaint, which sought to prevent the Shriner Tract from being taken into trust, "there appears to be no dispute that the relief plaintiffs have in mind at the present time is to remove the Shriner Tract from being held in trust or to somehow encumber how the land will be used while it remains in trust." Sac & Fox Nation of Mo. v. Kempthorne, 2008 WL 4186890, at *3.

It has long been the rule that the QTA provides the "exclusive means by which adverse claimants [may] challenge the United States' title to real property." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286 (1983) (emphasis added).[3] Moreover, it is equally well settled that the QTA's "prohibition of suits challenging the United States' title in Indian trust land may prevent suit even when a

---

[3] 28 U.S.C. § 1346(f) provides district courts with subject matter jurisdiction over QTA actions for which the United States has waived sovereign immunity under § 2409a.

plaintiff does not characterize its action as a quiet title action." Neighbors for Rational

Dev., Inc. v. Norton, 379 F.3d 956, 961 (10th Cir. 2004) (citation omitted); see also

United States v. Mottaz, 476 U.S. 834, 841-42 (1986).  These stringent rules are

designed to protect the "solemn obligations and specific commitments that the Federal

Government ha[s] made to the Indians regarding Indian lands." Mottaz, 476 U.S. at 843

n.6 (quotations omitted).

In determining whether a suit must be treated as a quiet title action sufficient to

invoke the QTA, we "focus on the relief sought by the plaintiffs." Kempthorne, 516 F.3d

at 842 (citation omitted).  Seeking to remove land currently held in trust by the United

States or to encumber that land constitutes a challenge to the government's title sufficient

to bring a claim within the ambit of the QTA, despite the fact that plaintiffs do not

themselves seek title to the land.  See id.; Neighbors, 379 F.3d at 961-62.  Consequently,

if plaintiffs' case is to proceed, it must do so exclusively under the QTA; the APA is no

longer relevant given the relief sought.

**B**

Plaintiffs attempt to avoid this conclusion by arguing that the Shiner Tract is not

"fully" in trust.  They do not contend that the United States lacks title to the Shriner

Tract, but rather argue that the land is not in trust within the meaning of the QTA for

three reasons.  First, plaintiffs claim the land was taken into trust subject to "a condition

subsequent":  the "resolution on the merits of the issues timely raised in the complaint."

According to the plaintiffs, this condition subsequent is evident from the Secretary's prior

-8-

representations to this court and the wording of our 1996 stay of the district court's TRO. We note that the primary purpose of the "conditions" language in our 1996 stay was to allow resolution of "the ultimate question of whether gaming shall be permitted on the subject land." In any event, we decline to consider plaintiffs' condition subsequent argument because they did not advance it before the district court. Although sovereign immunity and thus subject matter jurisdiction are at issue in this case, "our responsibility to ensure even sua sponte that we have subject matter jurisdiction before considering a case differs from our discretion to eschew untimely raised legal theories which may support that jurisdiction. We have no duty under the general waiver rule to consider the latter." Daigle v. Shell Oil Co., 972 F.2d 1527, 1539 (10th Cir. 1992) (citation omitted).

Second, plaintiffs argue that in Sac & Fox Nation of Missouri v. Norton, the Secretary represented that the Shriner Tract is not in trust for the purposes of the QTA, and that this representation constitutes the Department of the Interior's interpretation of 25 C.F.R. § 151.12(b).[4] Plaintiffs contend we should uphold this interpretation unless it is plainly erroneous. See City of Colo. Springs v. Solis, 589 F.3d 1121, 1135 (10th Cir. 2009). Yet even assuming the Secretary's representations to this court constitute agency interpretation, the issue here is not the effect of § 151.12(b), but of the QTA. Plaintiffs fail to make any reasoned argument that we should defer to agency interpretation of the

_____

[4] Section 151.12(b) provides that the Secretary must provide public notice at least thirty days before acquiring land in trust on behalf of a tribe, and establishes that a decision to acquire land in trust constitutes final agency action.

-9-

QTA.  Moreover, for Chevron deference to apply to an agency's interpretation of a statute, the agency must be responsible for its administration.  See Hydro Res., Inc. v. EPA, 562 F.3d 1249, 1260 (10th Cir. 2009).  Congress has not delegated the administration of the QTA to the Department of the Interior.  See 28 U.S.C. § 2409a.  Thus, the agency's interpretation of the QTA is not entitled to deference.

Third, plaintiffs argue that the Shriner Tract is not in trust because the Secretary's decision regarding acquisition was not authorized by law.  For purposes of the QTA, however, the Secretary need only make a colorable claim that the land is held in trust on behalf of an Indian tribe.  Wildman v. United States, 827 F.2d 1306, 1309 (9th Cir. 1987).  To hold otherwise would defeat the purpose of the Indian lands exception.  "The very purpose of the doctrine [of sovereign immunity] is to prevent a judicial examination of the merits of the government's position."  Id.  The United States has made such a colorable claim:  It has presented a facially valid title showing that it holds the Shriner Tract in trust for the Wyandotte Tribe.  Accordingly, the Shriner Tract is in trust for the purposes of the QTA, and if plaintiffs are to proceed, they must do so under the QTA.

## III

We must next consider the district court's conclusion that Congress has not waived sovereign immunity with respect to plaintiffs' challenge to the trust acquisition.  A district court's evaluation of sovereign immunity and its decision to dismiss for lack of jurisdiction are reviewed de novo.  Ordinance 59 Ass'n v. U.S. Dep't of the Interior Sec'y, 163 F.3d 1150, 1152 (10th Cir. 1998).

"The concept of sovereign immunity means that the United States cannot be sued without its consent." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jacks, 960 F.2d 911, 913 (10th Cir. 1992). Courts lack subject matter jurisdiction over a claim against the United States for which sovereign immunity has not been waived. Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1295 (10th Cir. 2009). Consequently, plaintiffs may not proceed unless they can establish that the United States has waived its sovereign immunity with respect to their claim. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); Sydnes v. United States, 523 F.3d 1179, 1182-83 (10th Cir. 2008).

**A**

As discussed supra, the APA provided a waiver of sovereign immunity for plaintiffs' action when they sought to prevent the Secretary from taking the Shriner Tract into trust. After the land was actually taken into trust, however, the nature of plaintiffs' claim changed. They now seek to remove the land from trust or otherwise encumber title. Although the QTA waives sovereign immunity for cases "to adjudicate a disputed title to real property in which the United States claims an interest," that waiver "does not apply to trust or restricted Indian lands." 28 U.S.C. § 2409a(a). Thus, we must decide whether a congressional waiver of sovereign immunity should be examined as of the time plaintiffs filed and served their complaint. If not, and sovereign immunity must be reassessed after filing, this court lacks jurisdiction.

**1**

Plaintiffs contend a time-of-filing rule applies because the Supreme Court has "consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events." Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 428 (1991) (citations omitted). But in Freeport-McMoRan, the Supreme Court was referring to diversity jurisdiction—the context in which the time-of-filing rule originated, see Mollan v. Torrance, 22 U.S. 537, 539 (1824). Subsequent to Freeport-McMoRan, the Supreme Court has clarified that the time-of-filing rule applies to "all challenges to subject-matter jurisdiction premised upon diversity of citizenship." Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 571 (2004) (emphasis added).

The time-of-filing rule is a judge-made doctrine, supported in the diversity context by sound policy considerations. See id. at 583 (Ginsburg, J., dissenting). In diversity cases, litigants are free to move between the states; no court may enjoin a civil litigant from changing her citizenship solely because she filed a complaint in federal court or had the misfortune to be sued. Thus, reassessing diversity jurisdiction after a complaint is filed and served would waste judicial resources and encourage manipulation. Cf. ConnectU, LLC v. Zuckerberg, 522 F.3d 82, 92 (1st Cir. 2008) (time-of-filing rule applies in diversity actions because "heightened concerns about forum-shopping and strategic behavior offer special justifications for it"); New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492, 1503 (3d Cir. 1996) ("From the outset, the underlying concern of the time of filing rule was the risk that parties would

-12-

deploy procedural tactics to manipulate federal jurisdiction.").[5]

In contrast, the time-of-filing rule "has been applied only rarely to federal question cases." Kabakjian v. United States, 267 F.3d 208, 212 (3d Cir. 2001) (quotation omitted); see also ConnectU, 522 F.3d at 92 (although there are outliers, "courts have been careful not to import the time-of-filing rule indiscriminately into the federal question realm"). "The only consistent use of the time-of-filing rule in federal question cases occurs in the area of removal—an area in which the danger of manipulation is high." ConnectU, 522 F.3d at 92 n.8. Even in diversity cases, "a district court can sometimes, after suit is filed, permit the destruction of subject matter jurisdiction." Kabakjian, 267 F.3d at 212. Accordingly, we reject plaintiffs' contention that the Supreme Court's statements regarding the time-of-filing rule in diversity cases control our analysis.

---

[5] Concerns regarding jurisdictional manipulation are not so pressing in Indian trust acquisition cases, however. Absent a time-of-filing rule, the government's discretion to manipulate jurisdiction is constrained. In contrast to courts' impotence in the face of a party who wishes to move to a new state, district courts do possess the power to restrain the Secretary from taking land into trust on behalf of a tribe. The Secretary is required to announce his intention to acquire land in trust on behalf of a tribe at least thirty days before trust acquisition. 25 C.F.R. § 151.12(b). During that thirty-day period, an APA challenge may be mounted, and a district court may issue a preliminary injunction preventing the land from being taken into trust. Of course, as this case demonstrates, the availability of injunctive relief will not always preserve a plaintiff's access to review. Injunctive relief is a creature of equity, and countervailing considerations may sometimes trump a plaintiff's interest in having her complaint adjudicated on the merits. See Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 377-78, 381 (2008) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

Relatively few cases have directly addressed the question of whether the existence of sovereign immunity must be assessed at the time of filing.  However, the Supreme Court did discuss that issue in the relatively early case of Beers v. Arkansas, 61 U.S. (20 How.) 527, 529 (1857).  There, plaintiff Beers sued the State of Arkansas in Arkansas state court to collect interest due on state bonds.  Id. at 528.  While the suit was pending, the Arkansas Legislature passed an act requiring state-bond claimants to present the bonds at issue to the court or face dismissal.  Id.  When Beers failed to produce the bonds, the state court dismissed the suit.  On appeal, the Supreme Court affirmed.  The Court's 1857 rationale regarding the supremacy of the doctrine of sovereign immunity guides our analysis today[6]:

> It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission; but it may, if it thinks proper, waive this privilege, and permit itself to be made a defendant in a suit by individuals, or by another State.  And as this permission is altogether voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be

---

[6] Beers dealt with state, rather than federal, sovereign immunity.  State sovereign immunity is based on the Eleventh Amendment, while the precise constitutional or historical basis for federal sovereign immunity remains a hotly contested matter.  See Paul F. Figley & Jay Tidmarsh, The Appropriations Power and Sovereign Immunity, 107 Mich. L. Rev. 1207, 1208-09 & n.6 (2009).  Although differences between these doctrines exist, principles of state sovereign immunity are helpful in the federal context, and vice versa.  See California v. Deep Sea Research, Inc., 523 U.S. 491, 506 (1998). Beers is particularly instructive in the context of federal sovereign immunity because it relies upon the inherent nature of sovereignty instead of the text of the Eleventh Amendment.  See 61 U.S. at 529-30.

conducted, <u>and may withdraw its consent whenever it may suppose that justice to the public requires it</u>.

<u>Id.</u> at 529 (emphasis added).

Although the focus of the Court in <u>Beers</u> was the contention that Arkansas' actions violated the Contracts Clause, <u>see</u> U.S. Const. art. I, § 10, cl. 1, we may not lightly disregard the holding that a waiver of sovereign immunity may be withdrawn "whenever [a sovereign] may suppose that justice to the public requires it," <u>Beers</u>, 61 U.S. at 529. The Supreme Court aimed this language squarely at post-filing withdrawals of consent to be sued, further stating that courts cannot "inquire whether the law operated hardly or unjustly upon the parties whose suits were then pending. . . . [The Legislature] might have repealed the prior law altogether, and put an end to the jurisdiction of their courts in suits against the State, if they had thought proper to do so . . . ." <u>Id.</u> at 530.

There is an irreconcilable conflict between the Court's holding that a state may withdraw a waiver of sovereign immunity in the throes of litigation and the time-of-filing rule plaintiffs ask us to endorse. If the existence of sovereign immunity were determined at the time a complaint is filed, a sovereign could not withdraw its consent after filing, as was permitted in <u>Beers</u>.[7]

---

[7] Contrary to plaintiffs' assertions, we do not read <u>Department of the Interior v. South Dakota</u>, 519 U.S. 919 (1996), to stand for the proposition that a time-of-filing rule applies to sovereign immunity determinations. In <u>South Dakota</u>, plaintiffs challenged the Secretary's taking of land into trust on behalf of an Indian tribe pursuant to a statute giving the Secretary broad discretionary authority to acquire "any interest in lands . . . for the purpose of providing land for Indians." 25 U.S.C. § 465. Plaintiffs argued that § 465

Continued . . .

The logic of <u>Beers</u> has withstood the test of time. Eleven years ago, the Supreme Court confirmed its continued adherence to <u>Beers</u>, noting, "We have even held that a State may, absent any contractual commitment to the contrary, alter the conditions of its waiver [of sovereign immunity] and apply those changes to a pending suit." <u>Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 676 (1999) (citing <u>Beers</u>). And seven years ago, the First Circuit—relying in part on <u>Beers</u>—rejected a time-of-filing rule with respect to sovereign immunity determinations. <u>Maysonet-Robles v. Cabrero</u>, 323 F.3d 43 (1st Cir. 2003).

In <u>Maysonet-Robles</u>, a group of plaintiffs filed suit against a corporate entity created by the Commonwealth of Puerto Rico to liquidate the proceeds of the Puerto Rico Urban Renewal and Housing Corporation. <u>Id.</u> at 46. While suit was pending, the Puerto

---

was an unconstitutional delegation of legislative authority. <u>See</u> <u>South Dakota v. U.S. Dep't of the Interior</u>, 69 F.3d 878, 881 (8th Cir. 1995). The Eighth Circuit ruled in favor of plaintiffs on the basis of § 465, declining to decide whether the QTA "precludes APA review of agency action by which the United States acquires title." <u>South Dakota</u>, 69 F.3d at 881 n.1 (emphasis omitted). Under then-existing agency regulations, the plaintiffs did not have meaningful access to judicial review prior to the trust acquisition. <u>Id.</u> at 880.

In response to the Eight Circuit's decision, the Department of the Interior adopted 25 C.F.R. § 151.12 to allow judicial review of the Secretary's decision to take land into trust before acquisition took place. <u>See</u> <u>South Dakota</u>, 519 U.S. at 920-21 (Scalia, J., dissenting). In light of the new regulation, the Supreme Court granted certiorari, vacated the Eighth Circuit opinion, and remanded the matter back to the Secretary. <u>Id.</u> at 919. The Court provided no explanation for its decision. Because the Court did not provide any analysis and because application of the QTA was not the sole issue in the case, we cannot presume the Court's rejection of the Eighth Circuit's judgment was based on application of a time-of-filing rule.

-16-

Rico Legislature passed an act dissolving the defendant entity and transferring all of its assets to the Department of Housing, which, as an arm of Puerto Rico, was entitled to sovereign immunity. Id. After substituting the Department for the original defendant, the district court dismissed the suit on sovereign immunity grounds, and the First Circuit affirmed. Id. at 46-47. Although the court acknowledged that the time-of-filing rule was well-established for certain jurisdictional inquiries, it held that "Plaintiffs' attempted analogies to the current case's context [were] ultimately unconvincing" because, "[u]nlike a private individual or corporation, a State retains its sovereign immunity as a personal privilege and, whether it is the original defendant or is added as a party later, it cannot be sued involuntarily." Id. at 50 (quotation omitted).

Noting that "it does not require a particularly jaundiced eye" to recognize that the Puerto Rico Legislature passed the act "with the precise goal of raising the shield of immunity" and that "[s]uch jurisdictional game-playing would be beyond the pale for any private litigant," the First Circuit nonetheless recognized that a judicially created doctrine cannot eclipse sovereign immunity. Id. at 51. "[I]t has been nearly a century and a half since Beers held that because the waiver of such immunity is entirely within the sovereign's prerogative, a State may alter the conditions of waiver and apply those changes to torpedo even pending litigation." Id. at 51-52 (citation omitted).

Despite its unequivocal holding, plaintiffs contend that Beers does not control this suit because executive, not legislative, action resulted in the withdrawal of the QTA sovereign-immunity waiver—and only legislative action can effectuate or withdraw a

-17-

waiver of sovereign immunity. See Jacks, 960 F.2d at 913. Their argument is misdirected. Congress designed the QTA in such a manner that its waiver of sovereign immunity necessarily turns on executive action in cases dealing with Indian trust lands: If the executive branch purchases land, the QTA waives sovereign immunity. 28 U.S.C. § 2409a(a). If the executive branch purchases land in trust for an Indian tribe, the QTA waiver of sovereign immunity does not apply. Id. Even outside the Indian trust context, executive action may dictate an answer to the sovereign immunity question: If the executive branch purchases land but later disclaims any interest in it, the QTA waiver of sovereign immunity does not apply. § 2409a(e).

Thus, as in Beers, legislative action is at issue. Congress provided within the text of the QTA itself that its waiver of sovereign immunity could be withdrawn, and that the conditions for withdrawal turned on executive branch action. In Beers, the legislature provided for a withdrawal of a waiver of sovereign immunity in a separate statute. We see no reason to treat these two situations differently.

In light of Beers, we cannot endorse a rule that freezes sovereign immunity status at the time a complaint is filed. Like the Maysonet-Robles court, we acknowledge that such a rule allows the government to manipulate pending cases in a manner prohibited in private litigation. Nonetheless, "we trust Congress, unlike any other entity, to set the rules of the game. . . . Congress may not always resolve the waiver issue wisely; nevertheless, the Constitution vests that decision in majoritarian hands. . . ." Harold J. Krent, Reconceptualizing Sovereign Immunity, 45 Vand. L. Rev. 1529, 1531 (1992).

-18-

We recognize that we must inevitably weigh in on an existing circuit split and that this opinion puts us at odds with two of our sister circuits, which have held that "the presence of a waiver of sovereign immunity [under the QTA] should be determined as of the date the complaint was filed." Bank of Hemet v. United States, 643 F.2d 661, 665 (9th Cir. 1981); see also Delta Savings & Loan Ass'n v. IRS, 847 F.2d 248, 249 n.1 (5th Cir. 1988) (adopting the Bank of Hemet rule without discussion).[8] In applying a time-of-filing rule, these circuits were of the opinion that "[t]he time is long past when the bar of sovereign immunity should be preserved through strained and hyper-technical interpretations of the relevant acts of Congress." Bank of Hemet, 643 F.2d at 665.

We disagree with Bank of Hemet and instead adopt the First Circuit's approach, which takes a view of sovereign immunity that is consistent with the Supreme Court's jurisprudence. Bank of Hemet and Delta Savings & Loan were decided during an era when many courts took an erroneously lax approach to interpreting waivers of sovereign immunity. Cf. College Sav. Bank, 527 U.S. at 676 (describing a 1964 case as the "nadir" of the Court's approach to sovereign immunity and waiver). After these cases were decided, the Court has reaffirmed its historically strict approach to sovereign

---

[8] In addition, two other circuits have applied a time-of-filing rule to assess the United States' waiver of sovereign immunity under 28 U.S.C. § 2410. See Kabakjian, 267 F.3d at 212; Kulawy v. United States, 917 F.2d 729, 733-34 (2d Cir. 1990) (adopting Bank of Hemet without discussion).

immunity. In <u>Lane v. Pena</u>, it clarified that courts <u>must</u> construe waivers of sovereign immunity narrowly:

> A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign. . . . A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text; the unequivocal expression of elimination of sovereign immunity that we insist upon is an expression in statutory text.

518 U.S. 187, 192 (1996) (citations omitted); <u>accord</u> <u>Orff v. United States</u>, 545 U.S. 596, 601-02 (2005). This more-recent jurisprudence demonstrates that a narrow construction of a sovereign-immunity waiver is not "strained and hyper-technical," <u>Bank of Hemet</u>, 643 F.2d at 665; rather, such interpretation properly provides due deference to congressional will. The Ninth Circuit itself appears to have stepped back from its earlier reasoning by limiting <u>Bank of Hemet</u> to its facts, albeit in an unpublished decision. <u>Ricks v. Whitney</u>, 77 A.F.T.R.2d (RIA) 96-1438 (9th Cir. Mar. 14, 1996) (unpublished).

As these more recent cases underline, waiver of sovereign immunity does not turn on judge-made rules but on congressional intent.[9] In enacting the QTA, Congress sought to preclude the relief plaintiffs pursue. "Congress' intent in excluding Indian trust lands from the Quiet Title Act's waiver of sovereign immunity was to prevent adverse

_____

[9] Courts generally look only to the plain text of a statute to determine whether Congress has waived the United States' sovereign immunity. <u>Lane</u>, 518 U.S. at 192. However, congressional intent is highly relevant when analyzing procedural matters surrounding waivers of sovereign immunity. <u>See</u> <u>Cooper v. Fed. Aviation Admin.</u>, 596 F.3d 538, 550 (9th Cir. 2010) ("[T]he scope of a waiver of sovereign immunity can be ascertained only by reference to the congressional policy underlying the statute.").

claimants from interfering with the United States' obligations to the Indians." Neighbors, 379 F.3d at 962. Suits challenging the United States' title to land held in trust on behalf of an Indian tribe inherently implicate not only the interest of the United States but also the interests of beneficiary tribes. As a result, "[a] unilateral waiver of the Federal Government's immunity" after land has been taken into trust would result in "abridgment of solemn obligations and specific commitments that the Federal Government ha[s] made to the Indians regarding Indian lands." Mottaz, 476 U.S. at 843 n.6 (quotations omitted). Such a waiver "would subject those lands to suit without the Indians' consent"—an outcome that Congress sought to avoid. Id.

That plaintiffs' suit was authorized at the time of filing does not alter our conclusion. A lawsuit challenging an unconsummated decision to take land into trust does not implicate a present interest of a tribe; it only implicates the tribe's potential interest in becoming a beneficiary at a future date. Moreover, Congress did not intend its waiver of sovereign immunity under the APA to swallow other statutory regimes. It specifically stated that nothing within the APA "confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. A challenge to the United States' interest in land held in trust for an Indian tribe is such a suit: relief is forbidden by the QTA. We therefore conclude that sovereign immunity is an ongoing inquiry rather than a determination to be made based on the existence of a waiver at the time of filing.

-21-

**B**

Plaintiffs advance three other arguments in their effort to avoid the sovereign immunity bar. First, they claim that we need not decide the issue of sovereign immunity because they are suing the Secretary, rather than the United States. They argue that the Secretary exceeded his authority in taking the Shriner Tract into trust, and that this ultra vires action strips the Secretary of the protections of sovereign immunity. The Supreme Court, however, has expressly disallowed officer suits that challenge the United States' title to Indian trust lands, noting, "If we were to allow claimants to try the Federal Government's title to land under an officer's-suit theory, the Indian lands exception to the QTA would be rendered nugatory." Block, 461 U.S. at 285. Consequently, plaintiffs may not avoid the question of sovereign immunity by naming the Secretary, rather than the United States, as defendant—even assuming the Secretary exceeded his statutory authority in acquiring the Shriner Tract.

Second, plaintiffs imply that our 1996 stay demonstrates that we retained jurisdiction over the case, and that we should give our retention of jurisdiction continuing effect. As noted supra, the "conditions" language in our 1996 stay was primarily intended to preserve review of the "ultimate question" of whether gaming would be permitted on the Shriner Tract. Regardless, this argument is plainly foreclosed by our opinion in Kempthorne, which held that this court's 1996 stay cannot serve to retain jurisdiction if sovereign immunity bars plaintiffs' claim. 516 F.3d at 845 ("Only Congress, not the courts, can waive the sovereign immunity of the United States.

Therefore, in the absence of clear congressional consent . . . [we lack the] jurisdiction to entertain suits against the United States." (quotation and alteration omitted)).  In no uncertain terms, we held that "the previous orders of this court . . . are <u>simply irrelevant</u>" to the question of sovereign immunity.  <u>Id.</u> at 846 (emphasis added).

Finally, plaintiffs urge us to apply equitable principles to avoid the bar of sovereign immunity.  They argue that judicial estoppel should prevent the Secretary from altering his position—asserted by the United States Attorney during the Wyandotte Tribe's emergency appeal of the TRO and continued to some degree during subsequent litigation—that staying the TRO would not deprive the federal courts of jurisdiction.  Nothing in the record suggests, however, that in urging this court to vacate the TRO in 1996, the Secretary represented we would retain jurisdiction over the trust-acquisition issue.  The record demonstrates only that the Secretary asserted we would retain jurisdiction over the ultimate dispute between the parties:  whether or not gaming can occur on the Shriner Tract.  As noted <u>supra</u>, that issue is alive and is being resolved.

More fundamentally, we again stress that prior representations to this court cannot impact our assessment of sovereign immunity.  In <u>Kempthorne</u>, we held that representations made by the Secretary—indeed, the very same representations at issue in this case—could not overcome congressional retention of sovereign immunity:

> Nor can the actions of the Secretary, or any government official or attorney, act as a waiver or abandonment of the United States' sovereign immunity. Because waiver must be unequivocally expressed by Congress, officers of the United States possess no power through their actions to waive an immunity of the United States or to confer jurisdiction on a court.  The

federal government's appearance in court through its officers and agents, therefore, does not waive the government's sovereign immunity. . . .

As a result of the strict jurisdictional nature of sovereign immunity, our waiver analysis is necessarily constrained to consideration of whether the Quiet Title Act itself waived the United States' sovereign immunity. Having already answered this question in the negative, . . . the conduct of the Secretary during litigation [is] simply irrelevant; without a valid congressional waiver, neither the district court nor this court possess jurisdiction to hear this case.

Id. at 845-46 (quotation and citations omitted). Because we look only to the words and the will of Congress when evaluating sovereign immunity, plaintiffs' equitable arguments have no merit.

**IV**

For the foregoing reasons, we hold that the district court's dismissal for want of jurisdiction was proper. The appeal is **DISMISSED**.