Filed 08/17/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re INTERNET LENDING CASES. | A156573 |
| KATHRINE ROSAS,<br><br>　　　Plaintiff and Appellant,<br>v.<br>AMG SERVICES, INC.,<br><br>　　　Defendant and Respondent. | CJJP No. 4688<br><br>(Alameda County<br>Super. Ct. No. RG07327031) |

　　　This appeal, before us for the second time, involves a representative action brought by plaintiff and appellant Kathrine Rosas against various defendants for their alleged participation in illegal internet payday loan practices.  Defendant and respondent in this matter, AMG Services, Inc. (AMG), is a wholly owned tribal corporation of former defendant Miami Tribe of Oklahoma (Tribe), a federally recognized Indigenous American tribe. AMG's motion to dismiss for lack of personal jurisdiction was granted by the trial court on the basis of tribal sovereign immunity—a ruling that Rosas herein challenges as erroneous as a matter of both law and fact.

　　　In her previous appeal, which we refer to as *Rosas I*, Rosas challenged a court order granting the motion by specially appearing AMG to quash service of summons for lack of jurisdiction and to dismiss.  As here, AMG's

1

motion was based on its assertion of tribal sovereign immunity.[1]  (*Rosas v. AMG Services, Inc.* (Sept. 28, 2017, A139147) [nonpub. opn.] (*Rosas I*).)  We reversed the order and remanded for further proceedings in light of a then recent California Supreme Court decision, *People v. Miami Nation Enterprises* (2016) 2 Cal.5th 222 (*Miami Nation*).

In *Miami Nation*, the defendants, like AMG, included several tribal business entities affiliated with two federally recognized tribes, defendants Miami Tribe of Oklahoma and Santee Sioux Nation, that were allegedly involved in illegal lending practices.  (*Miami Nation, supra*, 2 Cal.5th at p. 230.)  The California Supreme Court held that these affiliated entities were not immune from suit as "arms of the tribe" under a newly devised five-factor test that "takes into account both formal and functional aspects of the relationship between the tribes and their affiliated entities" and places the burden of proof on the entity claiming immunity.  (*Ibid.*)

Accordingly, in *Rosas I*, in light of this new standard, we issued the following mandate when remanding the matter back to the trial court:  "AMG is entitled to an opportunity to further develop the evidentiary record in light of its newly-announced burden under *MNE* [*Miami Nation*] to prove by a preponderance of the evidence that it is an 'arm of the tribe' entitled to tribal immunity.  (*MNE, supra*, 5 Cal.5th at p. 236.)"  (*Rosas I, supra*, at pp. 5–6.)  We then called upon the trial court to decide in the first instance based on the facts before it whether AMG could meet *Miami Nation*'s five-factor test.  (*Ibid.*)

---

[1] More detailed recitations of the procedural and factual background of these proceedings may be found in *Rosas I, supra*, A139147, as well as its two concurrently filed companion cases—*Baillie v. Processing Solutions, LLC* (Sept. 28, 2017, A144105 [nonpub. opn.]) and *Baillie v. Tucker* (Sept. 28, 2017, A141201 [nonpub. opn.]).

It was on remand that the trial court made the orders that are presently under challenge in this appeal. Specifically, the court granted the motion to quash and dismiss for lack of personal jurisdiction filed by AMG, again specially appearing, and denied Rosas's motion to strike AMG's motion to dismiss and for sanctions. In doing so, the trial court accepted AMG's argument that *Miami Nation*'s arm-of-the-tribe test should be applied to the current facts relating to its ownership and control at the time of the hearing rather than the facts that existed at the time the operative complaint was filed (or any other previous time). The court also credited AMG's newly produced, undisputed evidence concerning significant changes made to AMG's structure and governance since the prior court ruling—changes that, in effect, removed the nontribal actors (mainly, Scott Tucker and his affiliates) from positions of authority and control and ended its involvement in the business of financial lending. Applying these new facts to the *Miami Nation* test, the court found AMG entitled to immunity as an arm of the tribe.

For reasons discussed below, we now affirm the trial court's order to dismiss AMG from this case.

## FACTUAL AND PROCEDURAL BACKGROUND

Since this and related appeals have been before this court several times already, in the name of judicial efficiency we begin where *Rosas I* ended. On July 31, 2018, following our remand to the trial court, AMG filed a motion to quash/dismiss for lack of personal jurisdiction or, in the alternative, to dismiss the action as moot (hereinafter, motion to dismiss).

In support of this motion to dismiss, AMG offered new evidence that the non-tribe members who orchestrated AMG's involvement in internet payday lending, Scott Tucker and Timothy Muir, had been convicted and sent to jail and AMG, back under tribal control, had cooperated with law

3

enforcement efforts to secure their incarceration and provide relief for borrowers.

In particular, AMG offered evidence that it was established in 2008 by the Tribe through its business committee with the express purpose of " 'stimulat[ing] the economic development of the Tribe and increas[ing] the economic well-being of the Tribe's membership.' " Under its corporate structure, AMG was controlled by a three-member board of directors appointed by the business committee that, under a 2011 resolution amending AMG's articles of incorporation, was vested with " 'all the powers necessary to carry out the purposes of the Corporation and shall have control and management of the business and activities of the Corporation.' "

AMG acknowledged that, despite these formalities, "its day-to-day operations were controlled by Tucker and his cronies from its creation in 2008 through late 2012" and that "the vast majority of money that flowed through AMG during this time period was taken by Tucker and [his affiliates]." Beginning in 2012, however, the same year the original complaint was amended to include claims relating to Rosas's five payday loans,[2] the Tribe began taking action to wrest control of AMG away from Tucker and his associates. On November 19, 2012, AMG's board suspended AMG president and CEO, Don Brady, a Tucker cohort, and thereafter named Joe Frazier interim president and CEO, removed Don Brady as a signatory on all AMG accounts, and authorized Frazier to act as signatory on its accounts.

Also in 2012 and again in 2013, AMG transferred significant revenues—nearly $8 million in total—to the Tribe for its own operation,

---

[2] Rosas's loans were originated and paid off in 2005 and 2006, at least two years before AMG came into existence when the assets and liabilities of its predecessor company, CLK, were merged into it.

4

benefit, and use. Among other things, this money was used to fund a variety of tribal initiatives, including governmental operations, childhood development, and elderly assistance.

In March 2014, AMG's board formally directed AMG to cease operations. On March 28, 2014, AMG terminated contracts with the last two Tucker-affiliated entities with which it conducted business, BA Services, LLC and Impact BC, LLC. On April 5, 2014, AMG then terminated AMG's individual service relationship with Tucker. Thus, as of January 1, 2015, AMG had not engaged in or had any intention of resuming its debt collection or loan servicing activities.

Under tribal control, AMG then worked to settle the enforcement actions pending against it in both federal and California courts. As part of these settlements, AMG agreed to terms that included permanently ceasing all of its payday loan operations and forfeiting many millions of dollars, including $21 million to the Federal Trade Commission (FTC) in connection with its enforcement action.

Further, on February 10, 2016, AMG executed a nonprosecution agreement (NPA) with the United States Attorney for the Southern District of New York. Pursuant to the NPA, AMG was barred from committing any future crime and agreed to forfeit $48 million in proceeds from its payday lending business to the United States government.

In California, AMG agreed to walk away from at least $31 million in outstanding loans to California residents. Also, by court order entered on September 19, 2018, in an action brought by the state's Commissioner of the Department of Business Oversight, AMG was permanently enjoined from "offering, originating, or making a deferred deposit transaction" or "engaging in the business of a finance lender or broker" without "obtaining a license

5

from the Commissioner." AMG was also permanently enjoined from violating any provision of the California Deferred Deposit Transaction Law and the California Financing Law.[3]

Thus, by the time AMG moved for dismissal on July 18, 2018, the company: (1) had not engaged in payday lending or loan collection since January 1, 2015; (2) was under court orders to never again resume these activities; (3) had no remaining employees or officers; and (4) had become insolvent after paying out approximately $69 million in fines and settlements to government entities.

At the same time, in other proceedings arising from this payday lending scheme, Scott Tucker and his attorney, Timothy Muir, had been convicted and sentenced to jail; Scott Tucker and his associated entities had been ordered to pay the federal government $1.3 billion; and AMG's former attorney, Conly Schulte, had been indicted on charges of conspiracy to collect unlawful debts in connection with the "Tucker Payday Lending Organization." (See *United States v. Schulte* (U.S. Dist. Ct., S.D.N.Y., 2019, No. 1:19-cr-00456).) Meanwhile, Scott Tucker's brother and coconspirator, Blaine Tucker, had died.

On November 13, 2018, Rosas moved to strike AMG's motion to dismiss and for sanctions. Rosas argued that the court should strike AMG's tribal sovereign immunity defense as a sanction for its abuse of the litigation process. Alternatively, Rosas asked the court to find AMG judicially estopped

---

[3] As part of the final judgment, a monetary judgment totaling $41,717,800 was entered against AMG and MNE Services, Inc.. However, this judgment was considered "satisfied in full" based in part on credits awarded for the share of extinguished loans and federal settlements paid by AMG and MNE Services, Inc. in connection with their California loans, which amounted to $31 million and $7.6 million, respectively.

from asserting a position in its current motion to dismiss on immunity grounds that would be inconsistent with its previous position when asserting immunity. Rosas's arguments were based on the fact that AMG had submitted "sham declarations" in connection with its previous motion to dismiss, including one from former AMG president and CEO Don Brady. In Brady's declaration, he attested that the Tribe maintained control over the management and operation of AMG when, at the time, the Tuckers and their affiliates had complete managerial control over AMG. Rosas does not dispute that the Brady declaration was withdrawn by AMG in 2016, as were statements similar to those found in the Brady declaration that were included in a declaration filed by the Tribe's former chief, Thomas E. Gamble.

On December 17, 2018, after a contested hearing, the trial court granted AMG's motion to dismiss based on lack of jurisdiction and denied Rosas's motion to strike and for sanctions. The court first found that it was appropriate to consider whether AMG was entitled to tribal sovereign immunity based on AMG's circumstances at the time of the hearing on its motion (December 7, 2018), rather than at the time of the alleged wrongdoing or the filing of the complaint. The court then applied those current facts to *Miami Nation*'s five-factor test and determined that AMG was an "arm-of-the-tribe" and, as such, entitled to immunity. Accordingly, a judgment dismissing AMG from the case was entered on March 4, 2019, prompting this appeal.

## DISCUSSION

Rosas contends in the present appeal: (1) the trial court erred in finding as a matter of law that AMG's right to tribal sovereign immunity must be assessed as of the time of the hearing on its motion to dismiss rather than as of the time of its alleged wrongdoing or the filing of the complaint;

7

(2) AMG failed to meet its burden to prove under *Miami Nation* that it was an "arm of the tribe" and, as such, entitled to immunity; (3) AMG waived its right to claim immunity; (4) the trial court should have used its equitable authority to strike AMG's immunity defense based on its abuse of the litigation process; and (5) the trial court exceeded the scope of the remittitur this court issued in *Rosas I* when remanding for further proceedings in light of *Miami Nation*. We address each argument in turn.[4]

## I.    *AMG's right to immunity was correctly assessed based on the circumstances at the time of the hearing.*

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 58.) "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." (*Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 754.) Moreover, a waiver of sovereign immunity may not be implied; it must be unequivocally expressed by the tribe or Congress. (*C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla.* (2001) 532 U.S. 411, 414–420; *Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1193.) "In the absence of conflicting extrinsic evidence relevant to the issue, the question of whether a court has subject matter jurisdiction over an action against an Indian tribe is a question of law subject to our de novo review." (*Lawrence v. Barona Valley Ranch Resort & Casino* (2007) 153 Cal.App.4th 1364, 1369.)

Here, Rosas first raises a novel issue of law: When assessing whether a defendant is entitled to tribal sovereign immunity, does the trial court

---

[4] We grant plaintiff's request for judicial notice filed on December 4, 2019.

8

consider the factual record (1) at the time the court hears the motion to dismiss or (2) at the time the defendant engaged in the alleged wrongdoing or the plaintiff filed the operative complaint? In this case, the trial court concluded "as a matter of law that the court may examine sovereign immunity if the facts change during the course of the litigation and that the court evaluates [tribal] sovereign immunity and arm of the tribe immunity at the time the court hears the motion." Noting the lack of on-point California authority, the trial court relied on the following: (1) federal cases, (2) cases addressing diplomatic immunity, and (3) the law governing the immunity of California public entities. We agree that these sources are helpful.

Turning first to federal case law, the trial court correctly noted a split in authority as to the proper date on which to assess whether sovereign immunity exists. (Compare *Iowa Tribe of Kansas and Nebraska v. Salazar* (10th Cir. 2010) 607 F.3d 1225, 1237 ["sovereign immunity is an ongoing inquiry rather than a determination to be made based on the existence of a waiver at the time of filing"] (*Iowa Tribe*) and *Bank of Hemet v. Unites States* (9th Cir. 1981) 643 F.2d 661, 665 [determining the existence of a waiver of sovereign immunity at the time the complaint was filed].) In *Iowa Tribe*, the Tenth Circuit held that the existence of sovereign immunity must be determined as of the time of the hearing rather than the time the complaint was filed because, otherwise, the court would run afoul of longstanding United States Supreme Court authority recognizing that a sovereign may waive immunity from suit—and withdraw its waiver—at any time, even after a lawsuit is brought against it. (*Iowa Tribe, supra*, 607 F.3d at p. 1234, citing *Beers v. State of Arkansas* (1857) 61 U.S. 527, 529 (*Beers*).)

In *Beers*, the plaintiff sued the State of Arkansas in Arkansas state court to collect interest due on state bonds. (*Beers, supra*, 61 U.S. at p. 528.)

9

While the lawsuit suit was pending, the state legislature passed an act requiring state-bond claimants to present the bonds at issue to the court or face dismissal. (*Ibid*.) The lawsuit was dismissed on immunity grounds after the plaintiff failed to comply with this act. Affirming, the highest court held: "It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission; but it may, if it thinks proper, waive this privilege, and permit itself to be made a defendant in a suit by individuals, or by another State. And as this permission is altogether voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, *and may withdraw its consent whenever it may suppose that justice to the public requires it.*"[5] (*Id.* at p. 529; see *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.* (1999) 527 U.S. 666, 676 ["a State may, absent any contractual commitment to the contrary, alter the conditions of its waiver [of sovereign immunity] and apply those changes to a pending suit"].)

We conclude the Supreme Court's reasoning in *Beers* should guide our tribal sovereign immunity inquiry in this case. As with other sovereign entities, it is well established that a *tribal* sovereign entity cannot be sued in our courts without its consent and permission. Indigenous American tribes and tribal entities are "possess[ed] [of] the common-law immunity from suit traditionally enjoyed by sovereign powers . . . subject to the superior and

_____

[5] As to jurisdictional challenges premised on diversity of citizenship (unlike here), the Supreme Court has clarified that the time-of-filing rule applies in light of the particular risk that a defendant would try to procedurally manipulate federal jurisdiction by, for example, forum shopping. (*Grupo Dataflux v. Atlas Global Group, L. P.* (2004) 541 U.S. 567, 571.)

plenary control of Congress." (*Santa Clara Pueblo v. Martinez*, *supra*, 436 U.S. at p. 58; see *Three Affiliated Tribes v. Wold Engineering* (1986) 476 U.S. 877, 890.) Accordingly, it follows that a tribe or tribal entity may, like other sovereigns, assert or waive immunity at any time, even after a lawsuit is brought against it. (See *Iowa Tribe*, *supra*, 607 F.3d at p. 1234; *Beers*, *supra*, 61 U.S. at p. 529.) Further, as a necessary corollary of this, the status of a tribe or tribal entity's immunity is appropriately assessed by the court at the time of the motion to dismiss based on immunity, as was done in this case.

Supporting our conclusion are federal cases addressing the immunity from suit enjoyed by public entities and foreign diplomats. For example, in *Maysonet-Robles v. Cabrero* (1st Cir. 2003) 323 F.3d 43 (*Maysonet-Robles*), the First Circuit followed *Beers* when holding that sovereign immunity should be assessed as of the time of the hearing rather than the complaint's filing. (*Maysonet-Robles*, at p. 46.) There, plaintiffs, a putative class of homeowners and tenants of a low-income housing project, sued a corporate entity created by the Commonwealth of Puerto Rico to liquidate the project. (*Id*. at pp. 46, 47.) While the lawsuit was pending, Puerto Rico's legislature acted to dissolve this corporate entity and transferred all of its assets to Puerto Rico's Department of Housing, which enjoyed sovereign immunity. (*Ibid*.) The First Circuit affirmed the lower court's dismissal of the lawsuit on sovereign immunity grounds. In doing so, the First Circuit acknowledged "it does not require a particularly jaundiced eye" to recognize the Puerto Rico legislature passed the act "with the precise goal of raising the shield of immunity"—conduct the court described as "jurisdictional game-playing [that] would be beyond the pale for any private litigant." (*Id*. at pp. 46–47, 51.) Nonetheless, "[u]nlike a private individual or corporation, a State retains its sovereign immunity as a 'personal privilege' and, whether it is the

11

original defendant or is added as a party later, it cannot be sued involuntarily [citation]." (*Id.* at p. 50.)

In a similar case, *Kroll v. Board of Trustees of Univ. of Illinois* (7th Cir. 1991) 934 F.2d 904, the plaintiff sued the University of Illinois's athletic association, a non-state entity. After the plaintiff's complaint was dismissed with leave to amend, the plaintiff filed an amended complaint, again naming the athletic association. However, between the time the court dismissed the plaintiff's complaint and the time the amended complaint was filed, the state legislature passed legislation merging the association with a state entity, the university's board of trustees, which then sought dismissal on immunity grounds. Unconcerned with any apparent gamesmanship, the Seventh Circuit focused on the straightforward issue of whether the surviving state entity was entitled to immunity under the Eleventh Amendment of the federal Constitution: "Put simply, a state may claim immunity from suit in federal court and must be dismissed from the litigation unless there exists one of two well-established exceptions. [Citations.] First, a state may by unequivocal language waive the protections of the eleventh amendment and thereby consent to suit in federal court. [Citations.] Second, Congress may by unequivocal language use its enforcement powers under the fourteenth amendment to abrogate the states' eleventh amendment immunity." (*Id.* at p. 907.)

Also instructive are the diplomatic immunity cases cited by the trial court. In *Abdulaziz v. Metropolitan Dade County* (11th Cir. 1984) 741 F.2d 1328, 1332, the Eleventh Circuit answered in the affirmative the question of whether a certificate of diplomatic status granted after the commencement of a suit supports dismissal of the suit based on diplomatic immunity. Similarly, in *U.S. v. Khobragade* (S.D.N.Y. 2014) 15 F.Supp.3d 383, the

defendant's status at the time of her arrest was found *not* to be determinative because, as the court explained, " 'criminal immunity precludes the exercise of jurisdiction by the courts over an individual whether the incident occurred *prior to* or during the period in which such immunity exists.' Furthermore, several courts have held that diplomatic immunity acquired during the pendency of proceedings destroys jurisdiction even if the suit was validly commenced before immunity applied." (*Id*. at p. 387; see *Republic of Philippines v. Marcos* (N.D.Cal. 1987) 665 F.Supp. 793, 799; accord, *Zuza v. Office of the High Representative* (D.C. Cir. 2017) 857 F.3d 935, 938 ["[International Organizations Immunity Act] immunity does not operate only at a lawsuit's outset; it compels prompt dismissal even when it attaches mid-litigation"].)

Thus, based on this collection of cases discussing the doctrine of immunity in related contexts, we uphold the trial court's legal finding that whether AMG enjoys tribal sovereign immunity in this case should be assessed as of the time of the hearing on its motion to dismiss. As the United States Supreme Court aptly explained when discussing *foreign* sovereign immunity, "such immunity reflects current political realities and relationships, and aims to give foreign states and their instrumentalities some *present* 'protection from the inconvenience of suit as a gesture of comity.' " (*Republic of Austria v. Altmann* (2004) 541 U.S. 677, 696.)

## II. *AMG proved it was an "arm of the tribe" under* Miami Nation *and, therefore, is entitled to immunity.*

Now that we have established the correct timing for our inquiry, we consider whether AMG met its burden to prove it was an "arm of the tribe" as of the time of the hearing.

In *Miami Nation,* the California Supreme Court articulated a five-part test for determining whether an entity affiliated with a tribe qualifies as

13

"arm of the tribe" and, as such, is entitled to tribal sovereign immunity. (*Miami Nation*, *supra*, 2 Cal.5th at pp. 244–248.)  Under this test, the entity bears the burden of proving that the following considerations weigh in favor of its assertion of immunity:  (1) the entity's method of creation, (2) whether the tribe intended to extend immunity to the entity, (3) the entity's purpose, (4) the extent of control the tribe exerts over the entity, and (5) the financial relationship between the tribe and the entity.  (*Ibid.*)  "The ultimate purpose of the inquiry is to determine 'whether the entity *acts* as an arm of the tribe so that its *activities* are properly deemed to be those of the tribe.' "  (*Id.* at p. 250.)  No single factor is dispositive; rather, "[e]ach case will call for a fact-specific inquiry into all the factors followed by an overall assessment of whether the entity has carried its burden by a preponderance of the evidence."  (*Id.* at p. 248.)

We review the trial court's findings for substantial evidence.  "Under the deferential substantial evidence standard of review, findings of fact are liberally construed to support the judgment or order and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.  [Citation.]  'A single witness's testimony may constitute substantial evidence to support a finding.' "  (*Powell v. Tagami* (2018) 26 Cal.App.5th 219, 231 (*Powell*).)  Likewise, a statement set forth in a valid declaration may also constitute substantial evidence.  (*City of Crescent City v. Reddy* (2017) 9 Cal.App.5th 458, 466.)  " ' "It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility.  [Citation.]  "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." ' "  (*Powell*, at p. 231.)

14

## A. Method of Creation

This factor considers how the affiliated tribal entity was created. (*Miami Nation*, *supra*, 2 Cal.5th at p. 245.) Here, AMG was undisputedly created by the Tribe in 2008 under its tribal law. However, based on the significant role that Scott Tucker played in AMG's creation, the trial court found this factor nonetheless weighed against AMG's immunity.

Substantial evidence supports this finding. "Formation under tribal law weighs in favor of immunity . . . ." (*Miami Nation*, *supra*, 2 Cal.5th at p. 245.) However, "[t]he circumstances under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise, are also relevant." (*Id*. at p. 246.) Here, notwithstanding AMG's formal creation under tribal law, the record reflects Scott Tucker was the true driving force that caused, CLK, a limited liability corporation he owned and controlled, to be merged into AMG for the purpose of obtaining tribal immunity.

## B. Tribal Intent.

This factor looks to whether the tribe expressly or impliedly intended to extend its immunity to the affiliated entity. (*Miami Nation*, *supra*, 2 Cal.5th at p. 246.) The trial court found this factor weighed in favor of AMG's arm-of-the-tribe status. The record is in accord. Under AMG's articles of incorporation (original and restated), the Tribe conferred upon AMG "sovereign immunity from suit as an entity of the Tribe established to carry out purposes integral to the governance and operations of the Tribe." While the Tribe's express intent at the time of AMG's creation may have been clouded by Tucker's involvement, the Tribe reasserted its intent that AMG operate under tribal control after December 2012 when, among other things,

15

it severed ties with Tucker and his affiliates and reached settlements with the FTC, the Department of Justice, and the State of California.

### C. Purpose.

"This factor encompasses both the stated purpose for which the entity was created and the degree to which the entity actually serves that purpose." (*Miami Nation*, *supra*, 2 Cal.5th at p. 246.) AMG's articles of incorporation stated that its purpose was to "generate tax and other revenue for use by the tribal government in providing services to the Miami Tribe's reservation community." Undisputedly, prior to 2012, AMG's revenues were paid almost entirely for the benefit of Tucker and his affiliates rather than for the benefit of the Tribe. However, this situation began to change in 2012–2013, when AMG made two revenue distributions for the promotion of tribal self-governance, events weighing in favor of immunity. At the same time, as the trial court noted, by the hearing date, AMG had become a "detriment" to tribal self-governance as it "has no assets and appears to be a liability to the tribe."

It is unclear whether the trial court ultimately found that this factor weighed in favor of or against immunity. While perhaps a close call, we conclude this factor weighs in favor of immunity. While there is no doubt that AMG had become a financial detriment to the Tribe, it is also true that AMG was acting on behalf of the Tribe and in furtherance of its best interests when reaching settlements and other agreements with the various state and federal entities.

### D. Control.

This factor concerns "the entity's 'structure, ownership, and management, including the amount of control the Tribe has over the entities.' " (*Miami Nation*, *supra*, 2 Cal.5th at p. 247.) The trial court found

this factor weighed in favor of AMG's arm-of-the-tribe status.  Substantial evidence supports this finding.

There is no dispute that Scott Tucker controlled AMG prior to late 2012.  The record reflects, however, that since 2012 the Tribe had taken numerous steps to reassert its control over AMG, including:  (1) directing AMG to make distributions of its revenues for the benefit of the Tribe; (2) directing AMG to sever its ties to Scott Tucker and his affiliated companies; (3) reaching agreements with the FTC, the Department of Justice and the State of California whereby AMG was permanently enjoined from operating or otherwise engaging in payday lending activities and paid out millions in fines and restitution; and (4) directing AMG to permanently cease its lending operations.  Thus, at the time of the hearing, the Tribe did indeed control AMG, a circumstance weighing in favor of its arm-of-the-tribe status.

### E.    Financial Relationship.

This factor considers "the extent to which the tribe 'depends . . . on the [entity] for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities.' " (*Miami Nation*, *supra*, 2 Cal.5th at p. 248.)  The trial court found this factor neutral, given that at the time of the hearing AMG had no assets or employees and had ceased all operations.  The record, particularly the declaration filed by Chief Lankford, supports this conclusion.

### F.    Analysis.

After weighing these five factors, the trial court found that "after November 2012, and as of the date of this motion to dismiss that AMG was an arm of the tribe."  The court's decisionmaking was reasonable.  Moreover, as explained above, the court's decision was adequately supported by AMG's evidence, which demonstrated that, for at least the last seven years, AMG

17

had been under the Tribe's control and acting on its behalf and in its best interests, legally as well as financially. There is no basis on this record to disturb this ruling.

## III. *AMG has not waived immunity.*

Next, we reject Rosas's related argument that, even if AMG met its burden under *Miami Nation* to prove it was an arm of the tribe, AMG nonetheless waived its right to assert an immunity defense.

"Once the [tribal] entity demonstrates that it is an arm of the tribe, it is immune from suit unless the opposing party can show that tribal immunity has been abrogated or waived." (*Miami Nation*, *supra*, 2 Cal.5th at p. 236.) The law is well established that "a waiver of sovereign immunity ' "cannot be implied but must be unequivocally expressed." ' " (*Santa Clara Pueblo v. Martinez*, *supra*, 436 U.S. at p. 58.)

To prove waiver, Rosas relies on the agreement by which Scott Tucker's former company, CLK, was merged into and acquired by AMG. This merger agreement provided: "Purchaser [AMG] agrees to assume any and all liabilities of the company [CLK] whether arising or accruing prior to, on or after the effective date." According to Rosas, by agreeing to assume CLK's liabilities, AMG " 'clearly contemplated suits' and thereby waived any immunity it otherwise would have had."

Nothing in the merger agreement's language conveys the Tribe's unequivocal consent for AMG to be sued in state court, as the law requires. (*Amerind Risk Management Corp. v. Malaterre* (8th Cir. 2011) 633 F.3d 680, 688 ["plaintiffs have provided no evidence that [the tribal entity's] Board of Directors ever adopted a resolution waiving [the tribal entity's] immunity as to the plaintiffs' pending suit, and absent such a resolution, we cannot say that [the entity] unequivocally waived its sovereign immunity when it

18

generally assumed [its predecessor's] 'obligations and liabilities' "]; see *Multimedia Games, Inc. v. WLGC Acquisition Corp.* (N.D.Okla. 2001) 214 F.Supp.2d 1131, 1140 ["Absent an affirmative textual waiver in the terms of a contractual agreement or tribal constitution, federal courts have consistently declined to find tribal consent to federal jurisdiction"].) Moreover, under AMG's restated articles of incorporation, AMG was "authorized to" waive its tribal sovereign immunity only under certain circumstances through an "explicit" writing "unanimous[ly]" approved by AMG's board. Chief Lankford attested in his declaration that AMG "has not waived its sovereign immunity" in this or any related matter. Under these circumstances, Rosas's waiver argument fails. (See *Campo Band of Mission Indians v. Superior Court* (2006) 137 Cal.App.4th 175, 182–183 [waiver of tribal sovereign immunity "cannot be implied and, while no talismanic words are required, it must nonetheless be 'clear' "].)

## IV. *AMG's immunity cannot be stricken as a sanction.*

Rosas contends the trial court further erred by not using its "inherent authority" to strike AMG's tribal sovereign immunity defense as a sanction for its submission of declarations containing fraudulent statements about the Tribe's role in Tucker's payday lending scheme.[6] Rosas does not dispute that AMG's counsel withdrew these false statements in 2016.

In making this argument, Rosas identifies not a single case in which a court sanctioned a defendant by stripping the defendant of its right to assert

---

[6] In the federal enforcement action against Tucker and his counsel, Timothy Muir, it was determined that Muir "prepared false factual declarations from tribal representatives that were submitted to state courts, falsely claiming, among other things, that tribal corporations substantively owned, controlled, and managed the portions of [Tucker's] business targeted by state enforcement actions."

an *immunity* defense.  Instead, she relies on cases where the court dismissed a claim or defense as a sanction where there had been deliberate and egregious misconduct.  (See, e.g., *Stephen Schlesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 761–762, 764 [upholding sanction while acknowledging "[t]here are, of course, limits on the inherent authority of California courts—inherent power may only be exercised to the extent not inconsistent with the federal or state Constitutions, or California statutory law"].)

We reject Rosas's position and find her legal authority inapposite. Tribal sovereign immunity implicates jurisdictional principles.  (See *Miami Nation*, *supra*, 2 Cal.5th at p. 242 ["When a tribe asserts sovereign immunity, the plaintiff must show that the tribe's immunity has been abrogated or waived; if not, the court lacks jurisdiction"].)[7]  Thus, where, as here, a court determines that a tribal entity is entitled to immunity from suit, the court lacks the authority, absent the tribe's consent or federal authorization, to bring the tribal entity before the court for any purpose, including for the purpose of sanctioning misconduct.  (See *Three Affiliated Tribes v. Wold Engineering*, *supra*, 476 U.S. at pp. 890–891 ["The common law sovereign immunity possessed by the Tribe is a necessary corollary to Indian sovereignty and self-governance. . . .  [I]n the absence of federal

---

[7] Rosas mistakenly argues that the California Supreme Court in *Miami Nation* "clarified" that tribal immunity is "not jurisdictional in nature[.]"  The *Miami Nation* court did no such thing; rather, the court merely explained that "the jurisdictional nature of tribal immunity has never been definitively settled.  The [U.S. Supreme Court's] cases indicate that tribal immunity is jurisdictional in a general sense, but they have not elaborated further." (*Miami Nation*, *supra*, 2 Cal.5th at p. 243; see *id*. at pp. 243–244 [discussing split in federal circuit courts on whether claims of sovereign immunity affect a court's personal or subject matter jurisdiction].)

authorization, tribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States"]; see also *Miami Nation*, at p. 236 ["Once the entity demonstrates that it is an arm of the tribe, it is immune from suit unless the opposing party can show that tribal immunity has been abrogated or waived"].)  Rosas's argument, thus, necessarily fails.

## V.     *The court did not exceed the scope of our remittitur.*

Last, Rosas contends the trial court exceeded the scope of our 2017 remittitur when granting AMG's motion to dismiss for lack of personal jurisdiction because "AMG already had the opportunity to fully litigate its claim."

We disagree.  Our instruction to the trial court when reversing its earlier ruling and remanding for further proceedings was as follows: "[T]he appropriate course of action is to remand to the trial court so that it, rather than this court, may apply the new standard [under *Miami Nation*] to the facts at hand in the first instance. . . .  In this case, considerations of fairness and public policy—including the policy of deciding cases on their merits—so clearly weigh in favor of retroactivity that we do not hesitate to remand this matter to the trial court to apply [*Miami Nation*] in the first instance. [¶] At the same time, we . . . agree AMG is entitled to an opportunity to further develop the evidentiary record in light of its newly announced burden under [*Miami Nation*] to prove by a preponderance of the evidence that it is an 'arm of the tribe' entitled to tribal immunity.  (*Miami Nation, supra*, 5 Cal.5th at p. 236.)"  (*Rosas I, supra*, A139147, at pp. 4–6.)

As our instruction makes clear, the trial court had authority on remand to reopen discovery and allow new evidence on the "arm of the tribe" issue prior to reconsidering whether AMG was entitled to tribal sovereign

21

immunity under *Miami Nation*.  That is what we directed, and that is what the trial court did.  Accordingly, the order stands.

## DISPOSITION

The order to dismiss AMG from this case is affirmed.  AMG shall recover costs on appeal.

_____

Jackson, J.

WE CONCUR:

_____

Siggins, P. J.

_____

Petrou, J.

A156573/*Rosas v. AMG Services, Inc.*

A156573/Rosas v. AMG Services, Inc.

Trial Court:       Superior Court of the County of Alameda

Trial Judge:      Winifred Y. Smith, J.

Counsel:         Law Offices of Harold M. Jaffe and Harold M. Jaffe; Law Offices of Brian W. Newcomb and Brian W. Newcomb for Plaintiff and Appellant.

Fox Rothschild, Dwight C. Donovan and John C. Ekman for Defendant and Respondent.